AO 91 (Rev. 11/11) Criminal Complaint                    AUSA Megan DeMarco (312) 371-5698

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ROBERT NARUP

CASE NUMBER:

**UNDER SEAL**

21 CR 644



**FILED**
10/16/2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
MAGISTRATE JUDGE WEISMAN
JJ

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. From in or around October 2020 to October 15, 2021, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections, 922(a)(1)(A), 2 | ROBERT NARUP, defendant herein, willfully engaged in the business of dealing in firearms without being a licensed firearms dealer, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 2. |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

CHRISTOPHER LABNO

Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: October 16, 2021

*Judge's signature*

City and state: Chicago, Illinois

M. DAVID WEISMAN, U.S. Magistrate Judge

*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, CHRISTOPHER LABNO, being duly sworn, state as follows:

1.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), and have been so employed for approximately twenty years. I am currently assigned to the Chicago Field Office, Organized Crime Drug Enforcement Task Force—Chicago I Enforcement Group.

2.    My responsibilities include the investigation of violations of law as they relate to federal firearms offenses, including the unlawful possession of firearms or ammunition by convicted felons, firearms trafficking, violent crime, and narcotics trafficking. I employ various investigative tools such as the use of informants and witnesses, surveillance, controlled purchases of firearms and narcotics, firearms traces, telephone toll analysis, and the execution of both search warrants and arrests warrants.  As an ATF Special Agent, I have been involved in the investigations of numerous firearms offenses, violent crimes, and drug trafficking offenses.  I have also been the affiant for multiple search warrants, pen registers and court orders.

3.    This affidavit is submitted in support of a criminal complaint alleging that ROBERT NARUP has violated Title 18, United States Code, Sections 922(a)(1)(A) and 2. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging NARUP with engaging in the business of dealing in firearms without being a licensed firearms

dealer, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, interviews of witnesses, and review of audio/video evidence.

# I.     FACTS ESTABLISHING PROBABLE CAUSE

## *Summary*

5.     In or around September 2021, the Chicago Police Department and ATF began investigating a firearms-trafficking conspiracy in the Chicago and St. Louis areas. As described in more detail below, the scheme worked as follows: NARUP bought firearms at gun shows all over the country. NARUP then sold the firearms to an individual known to law enforcement ("Individual A") in St. Louis, Missouri.[1] Individual A then drove the firearms to Chicago and gave them to an individual who recently became a law enforcement confidential source ("CS-2").[2] Before CS-2 began

---

[1] Individual A agreed to cooperate in the hope of receiving cooperation credit for his October 8, 2021 arrest. No promises have been made to Individual A.

[2] CS-2 is cooperating in the hope of receiving credit in a pending firearm case. On or about September 23, 2021, Chicago Police Department ("CPD") officers stopped CS-2 and recovered a Glock 43x semi-automatic 9 mm pistol. CS-2 was under indictment in a felony narcotics case in the Circuit Court of Will County and was prohibited from having a firearm. CS-2 agreed to cooperate and consented to a search of his cell phone. No promises have been made to CS-2.

cooperating, CS-2 would give Individual A high-end marijuana in return for the firearms. CS-2 would then sell the firearms.

6.     On or about September 29, 2021, CS-2 set up a transaction with Individual A at law enforcement's direction. On or about October 8, 2021, Individual A met up with CS-2 and undercover ATF agents in an undercover meeting location in the Northern District of Illinois, and exchanged 22 firearms for what Individual A believed to be six pounds of high-end marijuana. Individual A was taken into custody, waived his rights, and identified NARUP as his supplier. In a series of recorded calls and text messages over the following week, Individual A, and law enforcement officers posing as Individual A, arranged to purchase firearms from NARUP in St. Louis, Missouri. On or about October 15, 2021, an undercover agent and Individual A met with NARUP and purchased approximately 18 firearms and 2 silencers[3] in exchange for approximately $14,000.

### *Background of the Investigation*

7.     On or about September 29, 2021, law enforcement met with CS-2 and interviewed CS-2 about CS-2's role in a firearms trafficking scheme. In a recorded interview, CS-2 related the following in summary, not verbatim.

a.     Approximately two to three years ago, CS-2 met a man he knew as "Jerry," later identified as Individual A, through Facebook groups selling specialty

---

[3] Based on my training and experience, a firearm silencer and a firearm muffler are defined as any device for silencing, muffling, or diminishing the report of a portable firearm. Firearm silencers are generally composed of an outer tube, internal baffles, a front end cap, and a rear end cap. A silencer also includes any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler.

sneakers. Approximately one year ago, CS-2 posted a photo of marijuana on Facebook, and Individual A asked CS-2 via Facebook messenger if CS-2 could get large quantities of marijuana. CS-2 sent Individual A pictures over Snapchat of large quantities of marijuana. Shortly thereafter, Individual A asked to trade firearms for the marijuana.

b. Individual A typically travelled from St. Louis, Missouri to Chicago to trade the guns for marijuana. The transactions between Individual A and CS-2 took place in residential garages in Chicago. According to CS-2, the first time Individual A and CS-2 exchanged guns for marijuana, in or around October 2020, Individual A gave CS-2 two firearms for "half a pound, some pre-rolls, and like other shit."

c. CS-2 related that, over the past year, CS-2 had exchanged marijuana for guns with Individual A at least ten times, and had obtained approximately 40 to 50 firearms from Individual A. According to CS-2, a typical trade was three firearms for every pound of high-end marijuana. CS-2 relayed that the firearms were all new and always came in a box. CS-2 believed the firearms had never been fired.

d. According to CS-2, the next deal with Individual A was to be four to five pounds of marijuana in return for twelve to thirteen firearms. Over the following week, CS-2 exchanged several recorded Facetime calls in the presence of law enforcement arranging to trade marijuana for firearms with Individual A.

### *September 29, 2021: CS-2 and Individual A Arrange Guns-for-Drugs Exchange*

8.     On or about September 29, 2021, at approximately 7:27 p.m., CS-2 called Individual A over Facetime in the presence of law enforcement at (314) 296-8878 ("Individual A Phone 1").[4] Law enforcement recorded the call.[5] The call took place in your affiant's undercover vehicle; your affiant was able to hear and observe the entire call. In summary, Individual A and CS-2 negotiated the quantities and prices of marijuana and firearms. Individual A also referred to his firearms supplier, an "old white man" (later identified as NARUP). Based on my training and experience and the training and experience of other agents, Individual A and CS-2 were negotiating how many firearms Individual A needed to bring in order to obtain the volume of marijuana and marijuana products that Individual A wanted. Individual A intended to re-sell or distribute the marijuana that he planned to receive from CS-2 in exchange for guns.

---

[4] Agents identified the phone as Individual A's by running the number through a commercial database, which showed that the phone number is associated with Individual A. Further, law enforcement could observe Individual A over Facetime during the recorded calls and compared observations of Individual A to a Missouri Driver's License photo of Individual A. They appeared to be the same person.

[5] This investigation included the use of consensually recorded phone calls and text messages. The summaries of recorded conversations in this affidavit do not include reference to all of the topics covered during the conversations. Further, quoted material from the recorded conversations as set out in this affidavit is taken from draft summaries, not final transcripts. The summaries do not include references to all statements made by the speakers on the topics that are described by the speakers.

### *October 6, 2021-October 7, 2021: CS-2 and Individual A Discuss Guns-for-Drugs Exchange*

9.      On or about October 6, 2021, at approximately 5:12 p.m., CS-2 Facetimed Individual A in the presence of law enforcement at Individual A Phone 1. The call took place in your affiant's undercover vehicle; your affiant was able to hear and observe the entire call. During the recorded call, CS-2 and Individual A again discussed the upcoming marijuana for drugs exchange. Individual A ordered six pounds of marijuana, pre-rolled cigarettes, and cartridges for vape pens. Individual A said he thought he had about 20 firearms to bring. The call ended with CS-2 stating that CS-2 would call back with the exact time CS-2 wanted to meet the next day.

10.     At approximately 5:28 p.m., CS-2 again Facetimed Individual A in the presence of law enforcement. During the recorded call, CS-2 and Individual A discussed what time to meet the next day. They then continued to negotiate the specifics of the deal. Individual A described to CS-2 the different types of Glock semi-automatic pistols he had in his inventory. Individual A said he would be willing to pick up additional Glocks from "an old white dude" (NARUP) if CS-2 had the product to trade. CS-2 assured Individual A CS-2 would have plenty of product for Individual A. Individual A said he had 21 guns and would try to grab three more. Individual A explained that the "old white dude" (NARUP) gave him 7 Glocks without boxes.

11.     Later that same day, in a series of recorded and unrecorded Facetime calls, CS-2 and Individual A spoke and decided to postpone the transaction until October 8, 2021, so Individual A could obtain several other firearms from his gun supplier, NARUP, and bring those extra guns to trade for marijuana.

12.     On or about October 7, 2021 at approximately 2:48 p.m., CS-2 Facetimed Individual A at Individual A Phone 1 in the presence of law enforcement. During the recorded call, CS-2 asked if everything was good for the transaction on Friday, October 8. Individual A listed the firearms he would bring for their trade. Individual A said he would call his source (NARUP) once Individual A was off the phone with CS-2. Individual A added, "He told me he had three Glocks plus that 29" (a Glock 29). Individual A said his source "said he was holding it for somebody, I'm like fuck that bro I want that 29." CS-2 told Individual A to get the Glock 29. Individual A told CS-2 that Individual A would arrive around 12 or 12:30. CS-2 said he would confirm the time later and send the address via text message to Individual A.

### October 8, 2021: Individual A Exchanges 22 Firearms for Marijuana

13.     On or about October 8, 2021, at approximately 12:45 p.m., CS-2 and undercover agents met with Individual A at an undercover meeting location in the Northern District of Illinois. Agents searched CS-2 for weapons or contraband with negative results. In addition, CS-2 and undercover agents were equipped with disguised audio and video recording devices.  CS-2 introduced the undercover agents to Individual A as CS-2's marijuana suppliers.

14.     As observed by law enforcement, Individual A pulled a plastic tub and several bags containing a total of 22 firearms out of the trunk of his vehicle.

15.     CS-2 and the undercover agents displayed to Individual A several different varieties of marijuana and marijuana vape cartridges as well as pre-rolled marijuana cigarettes. Individual A pointed out which varieties of marijuana he

wanted, picking out and asking for six pounds of specific different strains of marijuana and various marijuana products.

16.     Individual A then transferred the approximately 22 firearms (pictured below) to agents and attempted to take possession of the marijuana, which agents purported was in a sealed cardboard container.  Undercover agents then gave a pre-arranged arrest signal and Individual A was taken into custody.



***October 8, 2021: Individual A Identifies NARUP As His Supplier***

17.     Following his arrest on or about October 8, 2021, agents advised Individual A of his *Miranda* rights. Individual A waived his rights and spoke to agents in an audio/video recorded interview told agents, in summary:

        a.      He had obtained all 22 firearms that he sold to CS-2 from a white male in his late sixties Individual A knew as "Rob" (later identified as NARUP) who lived in Missouri.

  b. He believed that he had purchased over 40 firearms from NARUP which he subsequently trafficked to Chicago. Individual A advised that NARUP knew he (Individual A) took the firearms to Chicago and sold them to Individual A's marijuana supplier, who sold the guns on the street. Individual A stated that NARUP had advised that he (NARUP) acquired firearms from purchasing them from individuals at gun shows, then re-sold them at double the market price to Individual A and other firearms traffickers, who took the firearms to Chicago and California to sell on the street.

  c. He would meet with NARUP at various locations, most of which were halfway between Individual A's residence and NARUP's residence in Missouri. Agents' review of text messages corroborated Individual A's statement.

  d. He estimated that he had brought approximately 60 firearms to Chicago in exchange for marijuana in the past six months.

 18. Individual A provided agents with the cellular telephone number he had used to contact NARUP, (636) 577-2982 ("Narup Phone"). Agents ran the number through open-source commercial databases, which revealed that the number was associated with Robert NARUP at 102 Oak Street, Morrison, MO 65061.[6]

 19. Agents then showed Individual A an unlabeled photograph of NARUP and Individual A identified the person in the photograph as the firearms source he knew as "Rob."

---

[6] Agents later learned that NARUP owns that property and rents it out, but lives at 6945 Highway YY, Washington, Missouri with his girlfriend, as described below.

20.     On or about October 9, 2021, the Honorable Susan E. Cox signed a criminal complaint charging Individual A with one count of violating 18 U.S.C. § 924(c).

### *Individual A and NARUP's Messages About Firearms Transactions*

21.     On or about October 8, 2021, Individual A agreed to a consent search of his cellular telephones, an Apple iPhone associated with  Individual A Phone 1 and an Apple iPhone associated with the number (314)753-5338 ("Individual A Phone 2"), which he used to communicate with NARUP. After Individual A signed a written consent form, agents reviewed Individual A's text messages with NARUP, which went back approximately a year. Specifically, these text messages include conversations relating to the unlicensed dealing of firearms.

22.     Specifically, agents saw messages from on or about October 4, 2020 through October 8, 2021 between Individual A Phone 1 and Narup Phone.[7] Individual A, through the use of Individual A Phones 1 typically exchanged messages with Narup Phone every few days. The text messages contained communications related to the purchase of firearms, and logistics regarding arranging the transactions. For example, Individual A would ask NARUP what types of firearms NARUP had for sale, and NARUP would provide his firearms inventory. Also, NARUP would often text Individual A specific firearms he (NARUP) had acquired and were for sale.

---

[7] All phone communications between Individual A and NARUP (or agents posing as NARUP) referenced in this affidavit were from Individual A Phone 1.

Individual A and NARUP would then arrange times and locations for these transactions. For example:

a.      On or about October 4, 2020, at approximately 1:15 p.m., Individual A sent a text message to Narup Phone and  introduced himself as the individual who had previously purchased a Glock 19 from NARUP. Individual A asked NARUP to notify him (Individual A) if NARUP came across any additional Glock firearms. NARUP responded, "Will do." Individual A texted, "I can always meet wherever is fair as well." NARUP responded, "Alright are you just interested in just Glock's are other ones two blocks are getting tough." Individual A responded, "Glock are normally an instant sell dealing with me lol, but if it's a good price I'm typically interested as well !." NARUP responded, "Ok you'll be on my list."

b.      On October 5, 2020, at approximately 6:48 p.m., Individual A texted Narup Phone about a specific Glock pistol. NARUP responded that he (NARUP) had another customer interested in the Glock pistol. NARUP added that this customer, "He probably buys 50 or 60 guns a year from me."

c.      On or about October 11, 2020, at approximately 10:48 a.m., Individual A sent a text message to Narup Phone  inquiring about the previously mentioned Glock pistol and asked NARUP if the other customer had made the purchase. NARUP responded, "No he's out of state we got it set up for tomorrow evening I haven't forgot about you though."

d.      On or about November 2, 2020, at approximately 12:57 p.m., Individual A and NARUP exchanged messages deciding where to meet to conduct a

11

firearms transaction. Once a location was agreed upon Individual A asked, "I can hit the bank but do you take venmo or Paypal at all ?." NARUP responded, "No I don't. I kind of like 20s 50s and hundreds LOL."

   e. On or about December 2, 2020, at approximately 4:59 p.m., Individual A texted NARUP and asked what he (NARUP) had in stock. NARUP provided via text a list of firearms. NARUP stated, "Do you want to meet somewhere can show you about 10 guns or so." Individual A responded, "What time?" At approximately 7:58 p.m., Individual A asked, "we still on for 9," NARUP responded, "OK see you then if you can make it earlier that be fine." Individual A stated, "It's 54 mins away lol. You ever get any more glocks [pistols] ?" NARUP responded, "I got two at home and I'm holding onto them there that scares. Just one that big race car up and get her in pass gear. LOL." Individual A responded, "Haha I got you man I'll see you soon."

   f. On or about December 9, 2020, at approximately 3:49 p.m., Individual A reached out to NARUP and asked if he (NARUP) had any firearms from Branson. NARUP responded, "I have a Draco 556/223 $1600." Individual A responded, "1300?" NARUP stated, "That's just about what I gave for it. I'll do 15 tonight."

   g. On or about May 21, 2021, at approximately 5:23 pm, Individual A asked, "What ya got." NARUP responded, "Got seven blocks blocks oh you know what I mean got some other nine's you know me I don't know what the fuck all I got."

      h.    On or about June 5, 2021, at approximately 5:25 p.m., NARUP stated, "I have 10 for sure maybe 11 or 12." Individual A responded, "My man. Can we meet tomorrow? Or when's good." NARUP stated, "Be too late tomorrow I have to be Monday. Individual A stated, "That's fine. All Glocks?" NARUP responded, "No. About half of them."

      i.    On or about August 22, 2021, at approximately 9:27 pm, NARUP stated, "5.7 Ruger $950 box of ammo let me know." Individual A asked, "Box? What else you got?" NARUP responded, "I got seven or eight silencers fit9 mm 40 mm and 45s 150 each. And 22." Individual A stated that he (Individual A) was interested in Glocks.

      j.    On or about October 6, 2021, at approximately 8:03 p.m., Individual A asked, "Lol you still got those two Glocks?" NARUP stated, "Yes plus one more." Individual A asked, "What else?" NARUP responded, "Brand new 29 brand new with a light." Individual A asked, "A Glock 29? That's a 10 mil right?" NARUP responded, "Guy wants it but it's expensive I don't know if he's going to take it or not." Individual A asked, "Is it the 10 mil?" NARUP responded, "That be a 29 10 mm." Individual A asked, "How much rob? Because I need 3 more to leave tomorrow. Hoe much for the 3 you got." NARUP responded, "I think I got to not counting the 10 MM. You are to hook up with you tomorrow though I'm leaving early in the morning." Individual A asked, "Can I come to you tonight." NARUP responded, "I have to get up super early tomorrow in bed already." Individual A stated, "I want that 29 tho."

23.     Individual A stated that NARUP would visit gun shows on a weekly basis. As Individual A told agents, and as corroborated by agents' review of the text messages, Individual A would inquire early in the week what NARUP had obtained at each gun show. Individual A would consistently ask NARUP for Glock firearms. According to Individual A, NARUP would always offer Glocks for sale higher than the retail value: $750 versus $500. Based on my training and experience, these text messages are consistent with someone who acquires and then sells firearms for profit, which requires an ATF Federal Firearms License ("FFL").

24.     An FFL is a license in the United States that enables an individual or a company to engage in a business pertaining to the manufacture or importation of firearms and ammunition, or the interstate and intrastate sale of firearms. Review of a law enforcement database revealed that at all times relevant here, Individual A and NARUP were not and never have been, federally licensed to import, manufacture, deal, or engage in the business of dealing in firearms.

### *October 8, 2021: Individual A and Agents Arrange a Transaction with NARUP*

25.     On or about October 8, 2021, at approximately 7:19 p.m., at the direction of ATF Agents, Individual A, placed a monitored and recorded telephone call to NARUP at Narup Phone. When NARUP answered, Individual A advised that his customers liked the firearms Individual A had brought to them in Chicago that day.

26.     Specifically, Individual A told NARUP that Individual A's "boy in Chicago" (referring to CS-2) had asked Individual A what else NARUP had left,

meaning firearms. NARUP responded, "I got the one Hellcat," and, "I just picked up another 22, a nice one, a real nice one, and, and a 19."

27.    Individual A asked if NARUP still had the AR-15 type pistol NARUP had previously offered for sale, and NARUP responded, "Yeah … I've told you that a dozen times. I got one. I got a pretty nice, sharp one." Individual A asked how much, and NARUP responded, "Eight."

28.    Individual A asked NARUP whether he was going to any gun shows that weekend, and NARUP said he was headed to Springfield, Missouri for a show.

29.    Individual A asked NARUP to send a picture of the AR-15 pistol for Individual A's contact in Chicago. Individual A asked whether it was the "same one that you showed me the other day?" and NARUP responded, "Oh shit Jerry, I don't remember what I showed you," and added, "I had a 300 blackout but I sold that."

30.    Individual A asked what NARUP had "right now," and NARUP responded, "I got that .223 / 5.56mm it's a pistol, it's sharp." NARUP added, "I think I only got that one AR right now," and "I still got a 45 for you."

31.    Individual A said, "My boys in Chicago really been looking for like, 45s and big, uh, big calibers." NARUP responded, "I know he likes 40s, 45s right?" referring to Individual A's firearms buyer in Chicago. Individual A responded, "Correct."

32.    Individual A asked NARUP to send Individual A a picture of the AR-15 pistol to show his contact in Chicago, but NARUP was not at home so he could not

send a picture for about an hour. Individual A said he would catch up with NARUP when NARUP got back from the gun show.

33. A short time after the conversation ended, Individual A, at the direction of ATF Agents, told NARUP via text message that he would be in Chicago until October 13, 2021.

### October 14, 2021: Individual A and NARUP Negotiate Prices for October 15 Transaction

34. On or about October 13, 2021, agents used Individual A Phone 1 to contact NARUP posing as Individual A. Agents texted NARUP at Narup Phone and asked what firearms NARUP had acquired. NARUP stated, "I got about 10-12 which I'm sure you'd be interested in." NARUP said he had Glock 22s (.40 caliber semi-automatic pistols) a Glock 23 (.40 caliber semi-automatic pistol) and a Glock 43x (9mm semi-automatic pistol). In addition, NARUP said he still had an AR-15 type pistol for sale. Agents (posing as Individual A) asked NARUP if they could call him in the morning and arrange for a package deal. NARUP responded, "Ok."

35. On or about October 14, 2021, at approximately 12:00 p.m., Individual A placed a recorded telephone call to Narup Phone at agents' direction. When NARUP answered, Individual A and NARUP negotiated the purchase of ten to fifteen firearms, including several Glock pistols, an AR-Pistol, a Draco pistol, and a Springfield Hellcat pistol. Specifically, the following exchange occurred:

a. Individual A asked NARUP if he still had the guns the two had discussed the previous evening over text. NARUP responded, "I got two model 22s, a model 23 which is a .40, a 26 with a beam on it, what the fuck else I got—I got one

Hellcat, and I got some cheaper stuff, an XDS, ah, let see, one 17 … I probably got eight, nine Glocks or more." Individual A asked NARUP whether he had a Draco pistol and "the AR," meaning an AR-15 type pistol. NARUP responded, "Yes I do. Yeah. I thought I had it sold the other day but we were $50 apart and I'm a stubborn son of a bitch."

       b.     Individual A asked whether NARUP had ended up selling "that 29," and NARUP responded, "Yeah I did." When Individual A expressed disappointment, NARUP responded, "You wouldn't have paid me what I got for that anyway Jerry. I got $950 for that fucking gun." Individual A asked whether NARUP had sold it to "Z," and NARUP said no, that "another guy wanted it real bad." Individual A told NARUP that Individual A didn't like when NARUP dealt with "him" (meaning "Z") and not Individual A, and NARUP responded, "You been getting 75 percent of my guns … I haven't been selling many to Z."[8]

       c.     Individual A asked NARUP to put the Draco and the AR aside for Individual A. NARUP responded, "I got an AR, a small one, a pistol AR, for 800." Individual A responded that NARUP must have had a "good weekend," because the prices seemed low, referring to NARUP visiting the gun show in Springfield the previous weekend. NARUP responded, "I kicked ass up there in Springfield … I got two 45s too." Individual A said to bring those to the meeting, and some of the cheaper guns, too.

---

[8] Based upon Individual A's statements, as well as a review of the text messages between Individual A and NARUP, law enforcement believes that "Z" is a gun customer of NARUP's who traffics firearms from Missouri to Chicago and from Missouri to California.

37. Individual A and NARUP ultimately agreed to meet at a Walmart parking lot in Washington, Missouri at approximately noon on October 15, 2021 to conduct the firearms transaction.

### October 15, 2021: NARUP Sells 22 Firearms and Two Silencers to an Undercover Agent

38. On or about October 15, 2021, at approximately 1 p.m., NARUP met with Individual A and an undercover ATF agent ("UC") in a Walmart parking lot in Washington, Missouri. The UC was equipped with audio/video recording equipment. Individual A introduced the UC to NARUP as his (Individual A's) marijuana supplier, the man in Chicago to whom Individual A had been providing all the guns he had purchased from NARUP.

39. Individual A and the UC then chose approximately 18 firearms (pictured below) and two silencers from the plastic tubs of firearms in the rear of NARUP's vehicle. NARUP quoted prices for each firearm, often referring to a white paper tag with a price affixed to most of the firearms NARUP offered for sale. The UC asked NARUP if he still had the silencers he had shown to Individual A. NARUP stated that he did indeed have several silencers and displayed approximately three silencers to Individual A and the UC. The UC then chose two of the silencers and paid NARUP $150.00 for each. In total, the UC gave NARUP approximately $14,000.

40. Following the exchange, NARUP stated that the UC had "cleaned me out," and that NARUP had some "CZs left (CZ pistols) and I got a couple revolvers."

41. The UC told NARUP that the UC was "not just the weed man," and was trying to "diversify," and "that's why we've been doing this for six months." NARUP

responded, "Yeah." The UC continued that "all the shit he [Individual A] brought me [the UC] from you [NARUP] was fucking top-notch" and "good shit." NARUP responded, "Yeah." The UC asked if NARUP could start supplying the UC every two weeks, and NARUP said he could not guarantee that, but he would supply "what I can get." NARUP noted that "Z" had "slowed down." NARUP added that "He [Z] goes to California and he likes the longer stuff … he likes ARs." The UC asked NARUP how the UC could make himself NARUP's priority, and stated that Individual A could put the UC's orders in on the UC's behalf. NARUP said, "I try to keep him [Individual A] happy but he's been buying more shit from me than Z has." The UC noted again that his purported customers love NARUP's firearms, and asked how many guns NARUP had sold to Individual A. NARUP then asked Individual A, how many firearms "you think you bought from me in the past fucking … six months?" Individual A responded, "60?" and NARUP responded, "70."

42. The UC asked NARUP how many guns he typically bought at gun shows. NARUP responded, "It all depends. You might hit a good show … I know what he [Individual A] likes and don't like. He ain't going to get no fucking cowboy gun." (meaning no revolvers). "I know he likes FNs" (meaning Fabrique Nationale, a brand name of a firearms manufacturer) NARUP stated he'd like to get more FNs, but the price was "so goddamn high." Individual A said that price wasn't an object for the UC, and NARUP responded that if that were the case, he would pay extra money for "FNs."

43.     The UC and Individual A returned to the UC's car. NARUP was taken into custody.



***Post-Arrest Interview of NARUP***

44.     Following his arrest, NARUP was advised of his *Miranda* rights, waived them, and agreed to be interviewed. During the audio/video recorded interview, NARUP admitted that since his retirement in November of 2020, he has regularly gone to gun shows, purchased firearms from individuals, and then re-sold these firearms for profit to several individuals including Individual A. NARUP stated that this was a significant portion of his income.

45.     NARUP stated that he had been selling Individual A firearms for about a year, and that he knew that Individual A was taking these firearms to Illinois. NARUP admitted that on October 15, he had sold a man from Illinois (an undercover agent) who came with Individual A at least twelve to thirteen firearms for cash.

46.     Agents asked if NARUP recalled the UC making a statement to the effect that when he (UC) sold someone a gun and it was subsequently used in a shooting, that individual would return to purchase yet another firearm from the undercover agent in a beneficial business relationship.  NARUP stated "I do remember him saying that."

47.     NARUP admitted that he had sold Individual A about 40 to 50 firearms in the last six months, which NARUP understood Individual A took to Illinois and sold to an Illinois resident. In response to Agents' questions about NARUP's thoughts on his firearms being used in violent crime in Chicago, NARUP stated, "I think about it all the time."  When asked why he continued to sell guns to Individual A when he (NARUP) was concerned that the firearms he sold to Individual A could be used in violent crime in Chicago, NARUP stated, "I like dead presidents" (money).

48.     Subsequent to NARUP's arrest and interview, agents obtained consent to search NARUP's residence located at 6945 Highway YY, Washington, Missouri, from his girlfriend, who owns the residence. During the search, agents observed numerous empty firearms boxes, seized numerous rounds of ammunition and magazines, one firearm, and many white paper tags with prices similar to the ones attached to the firearms the UC purchased from NARUP.

## II. CONCLUSION

49.     Based on the foregoing, I believe there is probable cause to believe that, from in or around October 2020 to October 15, 2021, NARUP willfully engaged in the business of dealing in firearms without being a licensed firearms dealer, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 2.

FURTHER AFFIANT SAYETH NOT.

_____
CHRISTOPHER LABNO
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SWORN TO AND AFFIRMED by telephone October 16, 2021.

_____
Honorable M. DAVID WEISMAN
United States Magistrate Judge